**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTIRCT OF FLORIDA**

**CIVIL ACTION NO.**

| | |
|---|---|
| **AUGUSTINO SANTIAGO, LILLY LEYVA, GUILLERMO CREAMER, and MARIA ACEITUNO,** individually and as representative of a class of participants and beneficiaries on behalf of the University of Miami Retirement  Savings Plan, | |
| **Plaintiffs,** | **COMPLAINT – CLASS ACTION** |
| vs. | **JURY TRIAL DEMANDED** |
| **UNIVERSITY OF MIAMI,** | |
| **Defendant.** | |

1.      Plaintiffs Augustino Santiago, Lilly Leyva, Guillermo Creamer, and Maria Aceituno individually and as representatives of a class of participants and beneficiaries of the University of Miami Retirement Savings Plan ("Plan") bring this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Retirement Plan against Defendant University of Miami ("University" or "Defendant") for breach of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

2.      The duties of loyalty and prudence are "the highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As a fiduciary to the Plan, Defendant is obligated to act for the exclusive benefit of participants and beneficiaries, and to ensure that the Plan's expenses are reasonable and the Plan's investments are prudent. Because the marketplace for retirement plan services is established and competitive, and because the Plan has nearly a

billion dollars in assets, the Plan has tremendous bargaining power to demand low-cost administrative and investment management services, and well-performing investment funds. But instead of leveraging the Plan's massive bargaining power to benefit participants and beneficiaries, Defendant failed to investigate, examine, and understand the real cost to Plan's participants for administrative services, thereby causing the Plan to pay unreasonable and excessive fees for investment and administrative services. Defendant caused Plaintiffs to pay an asset-based fee for administrative services that increased as the value of participant accounts rose, even though no additional services were being provided. Further, Defendant selected and retained investment options for the Plan that historically and consistently underperformed their benchmarks and charged excessive investment management fees, as well as share classes that were more expensive than other share classes readily available to qualified retirement plans that provided Plan investors with the identical investment at a lower cost.

3.      Defendant was responsible for regularly monitoring all the Plan's investment choices and for periodically reviewing and evaluating the entire investment choice menu to determine whether it provided an appropriate range of investment choices into which participants could direct the investment of their accounts. Defendant, however, failed in those duties.

4.      Defendant selected as the Plan's a capital preservation fund an insurance company fixed-income account, the Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA-CREF"), TIAA Traditional Annuity, that prohibits participants from re-directing their investment in the Traditional Annuity into other investment choices during employment except in ten annual installments, effectively denying participants the ability to invest in equity funds and other investments as market conditions or participants' investment objectives change. The Traditional Annuity also prohibits participants from receiving a lump sum distribution

of the amount invested in the Traditional Annuity unless they pay a 2.5% surrender charge that bears no relationship to any reasonable risk or expense to which the fund is subject.

5.      One could reasonably infer from these circumstances alone that the Defendant's fiduciary decision-making process was either flawed or badly executed, but there is substantial additional evidence of a flawed process, such as incorrect reporting on mandatory Department of Labor disclosures about the amount of administrative fees paid by Retirement Plan participants.

6.      To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries in the Retirement Plan, brings this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendant's liability under 29 U.S.C. §1109(a) to restore to the Plan all losses resulting from each breach of fiduciary duty. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

7.      This action is similar (but narrower in scope) to a lawsuit filed against Duke University. *See Clark v. Duke University*, Case No. 1:16-cv-01044-CCE-LPA (M.D.N.C.). Judge Catherine C. Eagles presided over the Duke case. Judge Eagles recently approved a final class action settlement in the Duke case. Plaintiffs here seek similar remedies that were court approved in the Duke case.

### JURISDICTION AND VENUE

8.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

9.      This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, where at least one of the alleged breaches took place and where the Defendant resides.

## THE UNIVERSITY RETIREMENT PLAN

10.     The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

11.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

12.     Eligible faculty and staff members of the University are able to participate in the Plan. The Plan provides the primary source of retirement income for many University employees. The ultimate retirement benefit provided to participants depends on the performance of investment options chosen for the Plan by the University net of fees and expenses. Participants have the right to direct the investment of their accounts among the available investment choices

13.      The Plan has nearly one billion dollars of assets and is thus one of the largest defined contribution plans in the United States. Plans of such great size are commonly referred to as "jumbo plans."

## PARTIES

### Plaintiffs

14.     Plaintiff Augustino Santiago is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan. She has an active account in the Plan.

15.     Plaintiff Lilly Leyva is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan. She has an active account in the Plan.

16.     Plaintiff Guillermo Creamer is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

17.     Plaintiff Maria Aceituno is a participant in the Plan under 29 U.S.C. §1002(7) because her and her beneficiaries are or may become eligible to receive benefits under the Plan.

**Defendant**

18.     The University of Miami is a private, not-for-profit, nonsectarian institution of higher learning with its principal place of business in Miami, Florida.

19.     The University is the Plan Administrator under 29 U.S.C. §1002(16)(A)(i), and upon information and belief, with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it properly to carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

20.     The University is a fiduciary to the Plan because it exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

## FACTS APPLICABLE TO ALL COUNTS

**I.      Defendant's actions caused Plan participants to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable.**

21.      Recordkeeping is a necessary service for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to jumbo defined contribution plans, like the Plan. Recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

22.      To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans solicit competitive bids for the plan's recordkeeping and administrative services at regular intervals of approximately five years.

23.      The cost of recordkeeping and administrative services depends on the number of participants. The cost does not depend on the asset balance of the plan or the amount of savings held in a participant's account. Thus, the cost of providing recordkeeping services to a plan with an average account balance of $50,000 is the same as the cost of recordkeeping for a plan with the same number of participants and a $5,000 average account balance. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees based on a fixed dollar amount per participant rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping revenue increases without any change in the services provided.

24.      Jumbo defined contribution plans, like the Plan, possess tremendous economies of scale for recordkeeping and administrative services. As the number of participants in the plan increases, the per-participant fee charged for recordkeeping and administrative services declines.

These lower administrative expenses are readily available for plans with a greater number of participants.

25.    A practice called revenue sharing occurs when a mutual fund or other investment vehicle directs a portion of its asset-based expense ratio to the plan's recordkeeper, putatively for providing recordkeeping and administrative services for the investment. Because revenue sharing arrangements provide asset-based compensation for the recordkeeper, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper's compensation is reasonable for the services provided. A prudent fiduciary must ensure that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, negotiated recordkeeping fee. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive compensation or may be used as kickbacks to induce recordkeepers to have their high-priced funds included as plan investment options.

26.    Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

27.    According to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. See LIMRA Retirement Research, 403(b) Plan Sponsor Research (2013).[1]

---

[1] Available at http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.

28.     It is well known in the defined contribution industry that plans with dozens of

choices and multiple recordkeepers "fail" based on two primary flaws:

> **1. The choices are overwhelming**. Numerous studies have
> demonstrated that when people are given too many choices of
> anything, they lose confidence or make no decision.
>
> **2. The multi-recordkeeper platform is inefficient**. It does not
> allow sponsors to leverage total plan assets and receive appropriate
> pricing based on aggregate assets.

The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov.

2009)(emphasis in original).[2]

29.     The benefits of using a single recordkeeper are clear:

> By selecting a single recordkeeper, plan sponsors can enhance their
> purchasing power and negotiate lower, transparent investment fees
> for participants. Participants will benefit from a more manageable
> number of institutional-quality investment options to choose from.
> Participants will also benefit from customized and consistent
> enrollment, education and ongoing communication materials.[3]

30.     In a study titled "How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and

What Can Be Done to Fix It", Aon Hewitt similarly recognized:

> 403(b) plan sponsors can dramatically reduce participant-borne
> costs while improving employees' retirement readiness by:
>
>> – Reducing the number of investment options, utilizing an
>> "open architecture" investment menu, and packaging the
>> options within a "tiered" structure.
>>
>> – Consolidating recordkeepers to improve efficiencies and
>> reduce compliance-related risks.
>>
>> – Leveraging aggregate plan size and scale to negotiate
>> competitive pricing.

---

[2] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.
[3] *Id.*

AonHewitt, *How 403(b) Plans are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[4]

31.     Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers has caused:

> high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight . . . . Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[5]

32.     Others in the industry agree. *See, e.g.*, Kristen Heinzinger, Paring Down Providers: A 403(b) Sponsor's Experience, PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[6] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among

---

[4] 6Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

[5] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

[6] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors").[7]

33.     Use of a single recordkeeper is also less confusing to participants and avoids excessive recordkeeping fees charged to the Plans. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010) (recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[8]

34.     Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendant continues to contract with *six* recordkeepers (Fidelity Management Trust Company, TIAA-CREF, The Lincoln National Life Insurance Company, The Variable Annuity Life Insurance Company, New England Life Insurance Company, and MetLife). The inefficient and costly structure maintained by Defendant has caused Plan participants to pay and continue to pay duplicative, excessive, and unreasonable fees for Plan recordkeeping and administrative services. There is no loyal or prudent reason for Defendant's failure to engage in a process to reduce duplicative services and the fees charged to the Plan or to continue with six recordkeepers to the present.

---

[7] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

[8] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

35.     The Plan's recordkeepers received or currently receive compensation from revenue sharing payments and other sources of indirect and direct compensation from the Plan and their investments for providing these duplicative services.

36.     In addition, the Plan's recordkeepers receive additional indirect compensation, including revenue sharing for non-proprietary funds, float, securities-lending revenue, distribution fees, mortality and expense charges, surrender charges, spread and redemption fees.

37.     Based on information currently available to Plaintiff regarding the Plan's features, the nature of the administrative services provided by the Plan's recordkeepers, the Plan's participant level, and the recordkeeping market, benchmarking data indicates that a reasonable recordkeeping fee for the Plan would have been a fixed amount between of approximately $35 per participant with an account balance). Plan participants paid over $100 per year from 2013 to 2018 for recordkeeping; much higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

38.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[9] Even if participants pay only 25 basis points in excessive fees over a thirty-five-year period, it would mean the difference between receiving 12 monthly benefit payments a year and eleven.

39.     Defendant also failed to control recordkeeping costs as Plan assets grew. From May 30, 2012 to December 31, 2018, the Plan's assets increased from $224,116,882 (in 2012) to $837,292,389 (in 2018). Plan assets increased by more than 300%. Because revenue sharing

---

[9] 11 Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

payments are asset-based, the already excessive compensation paid to the Plan's recordkeepers became even more excessive as the Plan's assets grew, even though the administrative services provided to the Plan remained the same. Defendant could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plan as other loyally and prudently administered plans do, but failed to do so. Defendant's failure cost the Plan and its participants to sustain millions of dollars in losses.

40.     A competitive bidding process for the Plan's recordkeeping services should have produced a more reasonable recordkeeping fee for the Plan. This competitive bidding process would have enabled Defendant to select a recordkeeper charging reasonable fees, obtain a substantial reduction in recordkeeping fees, and rebate any excess expenses paid by participants for recordkeeping services. Considering the level of fees being paid by the Plan for recordkeeping, and the number of recordkeepers (six), a reasonable person could conclude that the University did not employ a competitive bidding process, or if it did, did not act in a manner consistent with the results of that process.

41.     Defendant failed prudently to monitor and control the compensation paid by the Plan for recordkeeping and administrative services, particularly the asset-based revenue sharing received by the Plan's recordkeepers. Had Defendant monitored the compensation paid to the Plan's recordkeepers and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost millions of dollars in their retirement savings over the last six years.

42.     Annual Returns on Form 5500 provide substantial evidence of that failure. The Plan's 5500's are essentially the Plan's annual tax returns. Department of Labor ("DOL") rules expressly require that plan services providers report all direct and indirect compensation received

for the year in connection with those services. None of the Plan's 5500's filed since 2012 disclose any amount of indirect compensation being received by the Plan's recordkeepers. In fact, all of the 5500's for the Plan affirmatively indicate that recordkeepers receive indirect compensation for recordkeeping services but in a contradiction state the amount received is "$0". This is patently false.

## II. The Plan's participant loan program is evidence that Defendant breached its fiduciary duties to the Plan and its participants.

43.     Further evidence of Defendant's ERISA breaches is provided the Plan's participant loan program. The program is administered by TIAA and VALIC; it operates in clear violation of the prohibited transaction rules and the conditions for the regulatory exemption from those prohibited transactions rules regarding plan loans.

44.     Ordinarily, when a plan participant borrows from a plan account, the participant is deemed to have invested the account in the loan. The loan proceeds are derived from liquidating the participant's investment, and the loan effectively becomes a "fund" in which the participant has invested. As an example, suppose that a participant has a current plan account balance of $60,000, allocated equally among three different mutual funds, Fund A, Fund B, and Fund C, and the participant elects to borrow $6,000 from the plan account. The plan trustee will liquidate $2,000 from each of the three investment funds and will distribute the $6,000 to the participant in exchange for a note signed by the participant, obligating the participant to repay the loan at a stated rate of interest.

45.     The usual retirement plan loan process is exemplified by the description in the Charles Schwab standardized loan policy for 401(k) plans:

> ***Each loan shall be an earmarked investment of the Participant's account***. Subject to any restrictions on withdrawals from a particular investment fund, loan proceeds will be taken pro rata from the

investment fund or funds in which the Participant's account balance is invested. However, loan proceeds will ***not*** be taken from any portion of a Participant's account that is invested in an employer stock investment fund. If a Participant has a Personal Choice Retirement Account®, such Participant will be contacted if funds in this account need to be liquidated to provide loan proceeds. As a loan is repaid a Participant's payments will be allocated to the investments he or she has selected under the Plan (or, where appropriate, investments that are considered the Plan's default investment fund(s)) on a pro-rata basis, based on the investment election in effect on the date a payment is deposited to the Plan. (Emphasis added.)

46.     Participant loans are governed by 29 CFR § 2550.408b-1, which requires, among other conditions, that a loan must bear a reasonable rate of interest. As provided in 29 CFR § 2550.408b-1(e), "[a] loan will be considered to bear a reasonable rate of interest if such loan provides ***the plan*** with a return commensurate with the interest rates charged by persons in the business of lending money for loans which would be made under similar circumstances." (Emphasis added.)

47.     Suppose at the time of the participant's loan, the commercial rate for such loans is 6%. As a result of the loan transaction described in paragraph 83, the participant's account will have $18,000 invested in each of Fund A, Fund B, and Fund C, and will have $6,000 invested in a loan paying 6% interest. All of the installment loan repayments will be credited to the participant's account, and the participant will earn the rate of interest charged on the loan.

48.     Loans made through TIAA and VALIC do not follow this loan process. Instead, TIAA's and VALIC's loan process requires a participant to borrow from TIAA's or VALIC's general account rather than from the participant's own account. In order to obtain the proceeds to make such a loan, TIAA and VALIC require each participant to transfer 110% of the amount of the loan from the participant's plan account—in our example, Fund A, Fund B, and Fund C—to TIAA's or VALIC's general account or an annuity as collateral securing repayment of the loan.

49.     These annuities are general account products, which means that all of the assets are held in TIAA's or VALIC's general account and are owned by TIAA or VALIC. Therefore, TIAA and VALIC also own all the assets transferred to its general account to "collateralize" the participant loan.

50.     Because the participant loan is made from TIAA's and VALIC's general account, the participant is obligated to repay the loan to TIAA's or VALIC's general account, and the general account earns all of the interest paid on the loan, in contrast to the loan programs for virtually every other retirement plan in the country, where the loan is made from and repaid to the participant's account and the participant earns all of the interest paid on the loan

51.     Any reasonable plan fiduciary who had performed a diligent and prudent review of this loan process should have been able to recognize the self-dealing inherent in the loan process and the inconsistencies with laws and regulations governing plan loans.

52.     These failures are not insignificant nor without consequence. The singular focus of the regulatory efforts of the Employee Benefits Security Administration of the Department of Labor for the past ten years or more has been the enhancement of reporting of plan financial information because of its critical importance to participants, who bear the burden of investment decisions, in effectively planning for their retirement. Even worse than ignorance on the part of participants, however, is the prospect of ignorance on the part of Plan fiduciaries who are charged with protecting the interests of those participants. The complete and utter failure to report TIAA's and VALIC's indirect compensation suggest that the University does not know what that compensation is.

53.     Likewise, the approval of a loan process that is in clear violation of ERISA rules and that is designed to generate profits for TIAA and VALIC at the expense of Plan participants

provides demonstrable proof of Defendant's flawed fiduciary decision-making process. Defendant's failure to comprehend and act on the compensation scheme created by TIAA and VALIC for its participant loan program simply cannot be explained.

**III.    Defendant freighted the Plan's investment lineup with imprudent investments.**

54.    ERISA requires fiduciaries to independently evaluate the prudence of each investment option offered in a defined contribution plan. As noted above, the Plan includes a staggering array of over 390 investments in its investment lineup.

55.    Having such a monumental number of investments in the investment lineup places a monumental burden on the Plan's participants in selecting investments in which to invest. An investment options objectives, goals, investment strategies, principal risks, historical performance, fees and expenses, and managers, among other information are set forth in a prospectus. Prospectuses are designed to educate a potential investor and provide material information to enable her to make an informed, prudent-investment decision. The Plan includes the Fidelity Freedom Index Funds in its investment lineup. For these funds alone, the prospectus spans almost 800 pages. If a Plan participant were to review the prospectuses of all of the 390+ investment options in the Plan investment lineup, this would require reading thousands if not tens of thousands of pages of documents. This is a virtually impossible burden. Even for the University, it is inconceivable that it has read the prospectuses and supporting materials for the investments it selected for the Plan.

56.    In comparison to the 390+ investments in the Plan, industry surveys and reports show that defined contribution plans have an average of 15 investment options, excluding target date funds. This benefits participants by avoiding confusion and obtaining lower fees. It is also the output of an evaluation and selection by a prudent fiduciary of the "best in class" investment choice

in a particular investment style as opposed to what appears to be the case here – a fiduciary simply allowing the investment lineup to be freighted with whatever investments recordkeepers or other third-parties want in the Plan. The Plan investment line up here is strong evidence of almost a *per se* violation of ERISA's fiduciary duties.

57.     Defendant allowed the Plan's recordkeepers to freight the Plan's investment lineup with essentially the entirety of their investment options on the Plan's menu, including allowing recordkeepers to put newly created investments in the Plan without any prior screening by a fiduciary. The Defendant caused hundreds of investments to be provided to the Plan without making any independent determination that such investments were prudent, reasonably priced, and provided for the exclusive purpose of providing benefits to Plan participants. This shows that Defendant failed to employ a prudent and loyal process in the selection and retention of Plan investment options.

58.     Investment selection must be the result of a detailed due diligence process that considers factors such as risk, investment return and expenses of available investment alternatives, and the fiduciary must give "appropriate consideration" to "the role the investment or investment course of action plays … in the plan's investment portfolio." 29 C.F.R. §§2550.404a-1(b)(i)-(ii). Fiduciaries cannot discharge their duties by the simple expedient of including a very large number of investments alternatives in its portfolio and then shifting to the participants the responsibility of choosing among them. This removes the benefit of pooling assets consistent with the size of the Plan. Assembling a haphazard lineup of over 390 duplicative investments that are proprietary to the recordkeepers and shifting to Plan participants the burden of screening those options does not reflect a prudent investment selection process.

59.     Additionally, if a plan invests in mutual funds, fiduciaries must review and consider the available share classes. Because typically the only material difference between various share classes is fees, selecting higher-cost share classes results in the plan paying wholly unnecessary fees. Accordingly, absent some compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan.

60.     Given that defined contribution plan fiduciaries are held to the standard of a knowledgeable financial expert, a fiduciary should know the basic principle that asset size matters, and must review a fund's prospectus to determine if a lower-cost share class of the same fund is available, to avoid saddling the plan with unnecessary fees.

61.     Defendant selected and continues to retain Plan investment options with far higher costs than were and are available for a plan of its size for the exact same mutual funds. Defendants' use of higher-cost share classes instead of available lower-cost share classes for the identical mutual fund caused Plan participants to lose millions of dollars of their retirement savings due to unnecessary fees.

## IV.     Defendant imprudently retained historically underperforming Plan investments.

62.     Given Defendant's failure to conduct appropriate due diligence in selecting and retaining Plan investments, numerous investment options underperformed lower-cost alternatives that were available to the Plan. Two investments are described below to illustrate the point.

### A.     CREF Stock Account

63.     The Plan holds $16,584,502 CREF Stock Account. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. In its Prospectus, the CREF Stock Account states that it "invests at least 80% of its assets in a broadly diversified portfolio of common

stocks." This option has for years historically underperformed and continues to underperform its benchmark and lower-cost actively and passively managed investments that were available to the Plan.

64.     TIAA-CREF imposed restrictive provisions on the specific annuities that must be provided in the Plan. Under these terms, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional and the CREF Money Market Account. Plan fiduciaries provided these mandatory offerings in the Plan without a prudent process to determine whether they were prudent alternatives and in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plan to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. Prior to creation of three separate share classes for the CREF Stock Account in mid-2015, the CREF Stock Account paid 56 bps for revenue sharing as administrative expense and "distribution fees", which exceeded other TIAA-CREF investments by over 50% (15 bps).

65.     Defendant apparently failed to undertake a thorough analysis when it selected and retained the actively managed CREF Stock Account, and thereafter failed to adequately to monitor the fund and persistently ignored the readily available data of the fund's underperformance, particularly due to TIAA-CREF's requirement that the CREF Stock Account be provided in the Plan in order to drive revenue to TIAA-CREF. Defendant also provided the fund option without conducting a prudent analysis despite the acceptance within the investment industry that the large cap domestic equity market is the most efficient market, and active managers do not outperform passive managers net of fees in this investment style.

66.     Had Defendant conducted such an analysis, it would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

67.     Rather than performing poorly in a single year or two, the CREF Stock Account has performed worse, over a period of many years than both available lower-cost index funds and the index benchmark. In participant communications, Defendant and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the fund's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same investment style for the one-, five-, and ten-year periods ending December 31, 2014.[10] The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Inst Pl) (VITPX) and the Vanguard Institutional Index (Inst Pl) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments. For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives.

---

[10] 18 Performance data provided as of December 31, 2014.



68.     The CREF Stock Account, with an expense ratio of 70 bps during most of the relevant period, and dropping to 38 basis points in 2015, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund (Inst Plus) (2 bps) and the Vanguard Institutional Index (Inst Plus) (2 bps).

69.     Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one-, five-, and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity (Inv) (VDEQX), the Vanguard PRIMECAP (Adm) (VPMAX), and the Vanguard Capital Opp. (Adm) (VHCAX).



70.     The CREF Stock Account also had a long history of substantial underperformance

compared to these actively managed alternatives over the one-, five-, and ten-year periods ending

December 31, 2009.[11]

---

[11] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP (Adm) and Vanguard Capital Opportunity Fund (Adm), the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP (Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), was 5.89%.







71.     Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of  70 bps during most of the relevant period, and dropping to 38 basis points in 2015, was more expensive than better performing actively managed alternatives: the Vanguard Diversified Equity (Inv) (36 bps), and the Vanguard PRIMECAP (Adm) (33 bps).

72.     Reflecting the abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry.

73.     In March 2012, an independent investment consultant, Aon Hewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plan. Aon Hewitt, TIAA-CREF Asset Management, INBRIEF, at 3 (July 2012).[12] This recommendation was due to numerous factors, including the historical

---

[12]     Available     at     http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

underperformance, high turnover of asset management executives and portfolio managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id.* at 4–5.

74.     The Supreme Court recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of a prudent fiduciary, Defendant failed to conduct a prudent process to monitor the CREF Stock Account and continues to retain the fund despite its continuing underperformance compared to lower-cost investment alternatives readily available to the Plan and the opinion of one of the foremost authorities in the retirement investment industry that *no* retirement plan should own this fund.

75.     Prudent fiduciaries of defined contribution plans are required to and do continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plan.

76.     Had the Defendant removed the CREF Stock Account and the amounts been invested in any of the actively managed lower-cost alternatives or the passively managed lower-cost alternatives, as set forth herein, Plan participants would not have lost millions of dollars' worth of their retirement savings.

**B.     TIAA Real Estate Account**

77.     Defendant selected and continues to offer the TIAA Real Estate Account as a real estate investment option in the Plan. The Plan has roughly $5.5 of assets in the fund. The fund has

far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Inst) (VGSNX).

78.     With an expense ratio of 88.5 bps as of December 31, 2015, the TIAA Real Estate Account charges excessive an unreasonable fees. It is also over 10 times more expensive than the Vanguard REIT Index (Inst) with an expense ratio of 8 bps.



79.     The TIAA Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009.[13] Despite this, Defendant selected and continues to retain it in the Plan.

---

[13] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard



80.     This underperformance occurred for years before 2009 and has continued afterward. The TIAA Real Estate Account vastly underperformed the Vanguard REIT Index (Inst) over the one-, five-, and ten-year periods ending December 31, 2014.[14]

---

REIT Index (Inst) was 5.49%.

[14] Performance data provided as of December 31, 2014 to correspond to the most recent filing of the Plan's Form 5500 with the Department of Labor.



81.     The very design of the TIAA Real Estate Account creates such operational difficulties, and burdens investors in the fund with such significant additional expense, that a reasonable plan fiduciary should have questioned whether the fund was an appropriate investment at all for participant-directed individual account plans like the Plan.

82.     The TIAA Real Estate Account is an insurance company pooled separate account, meaning that all the assets held in the account are plan assets and all the transactions involving those assets are subject to the prohibited transaction rules of ERISA § 406. As a result, TIAA has had to obtain an individual prohibited transaction exemption from the Employee Benefit Security Administration of the DOL just to be able to offer the fund as an investment choice to ERISA

plans. One of the conditions of that exemption is that TIAA must retain the services of an independent fiduciary to review and approve nearly every transaction in which the fund engages, adding significant additional expense to the operation of the fund.

83.     Additionally, the fund invests directly in real property assets that are highly illiquid. In order to manage the liquidity problem, TIAA guarantees the liquidity of participant accounts invested in the Real Estate Account, but charges participants an additional 17 basis points for that liquidity guarantee.

84.     The Real Estate Account charges participants 29.5 basis points for recordkeeping expense, whereas the R3 share classes of the variable annuities currently charge only 14.5 basis points.  A reasonable fiduciary would have questioned why, for a participant invested in the Real Estate Account, recordkeeping should cost double what it costs a participant invested in the variable annuities, and would have determined that there is no difference in cost, especially when all the accounting, appraisal and other costs associated with valuation are already being paid by the Real Estate Account.

85.     Finally, the Real Estate Account has and continues to charge 12.5 basis points for "distribution fees."  Any reasonable fiduciary would have questioned why TIAA is charging a distribution fee to distribute its own fund; this is a fee that gets paid to TIAA.  The fact that TIAA may require plans to include the Real Estate Account in a plan's menu of investment choices only adds insult to injury.

86.     The Real Estate Account's poor performance coupled with 44.5 basis points in excessive fees makes the TIAA Real Estate Account an exceedingly poor choice by any measure and speaks for itself in evaluating the performance of Defendant's fiduciary obligation to act solely

in the best interest of participants for the exclusive purpose of providing them benefits under the Plan.

87.     As the Supreme Court unanimously ruled in *Tibble*, prudent fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investments. 135 S. Ct. at 1829. Defendant failed to conduct such a process and continues to retain the TIAA Real Estate Account as a Plan investment option, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

88.     Had Defendant removed just the TIAA Real Estate Account and the amounts been invested in the lower-cost and better-performing Vanguard REIT Index, Plan participants would not have lost millions of their retirement savings.

## ERISA'S FIDUCIARY STANDARDS

89.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendant as fiduciary of the Plan. 29 U.S.C. §1104(a)(1), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)  for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries; and
> > (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

90.     Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to

participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

91.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

92.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
> >
> > (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

93.     29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial

relief as the court may deem appropriate, including removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

94.     29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of either of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109(a).

95.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the University of Miami Retirement and Savings Plan from May 1, 2014, through the date of judgment, excluding the Defendant or any participant who is a fiduciary to the Plan, excluding those individuals serving or who have served in a fiduciary capacity to the Plan, and the members of their immediate families.

96.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a. The Class includes over 16,000 members and is so large that joinder of all its members is impracticable.

b. There are questions of law and fact common to this Class because the Defendant owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.SC. §1109(a); whether the

- 32 -

fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendant's breach of duty.

c. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were participants during the time period at issue in this action and all participants in the Plan were harmed by Defendant's misconduct.

d. Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interests that are in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant in respect to the discharge of its fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.  Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

97.     A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual

members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

98.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

## COUNT I

### Breach of Duties of Loyalty and Prudence—Unreasonable Administrative Fees

99.     Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

100.    The scope of the fiduciary duties and responsibilities of the Defendant includes discharging its duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA. Defendant is directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

101.    Defendant selected and retained as the Plan's investment options investment funds and insurance company annuities that caused the Plan to incur far higher administrative fees and expenses relative to the size and complexity of the Plan.

102.     For years Defendant failed to engage in a prudent process for the evaluation and monitoring of amounts being charged for administrative expense, allowing the Plan to be charged an asset-based fee for recordkeeping calculated in a manner that was completely inconsistent with a reasonable fee for the service and was grossly excessive for the service being provided.

103.     Had a prudent and loyal fiduciary conducted a process for the retention of investment options, it would have concluded that the Plan's investment options were retained for reasons other than the best interest of the Plan and its participants, and were causing the Plan to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable asset-based fees for fixed administrative services.

104.     Defendant's failure to properly evaluate the reasonableness of amounts being charged to the Plan has caused Plaintiff and the Class millions of dollars in direct economic loss. The Plan's total losses will be determined after complete discovery in this case and are continuing.

105.      Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

**COUNT II**

**Breach of Duties of Loyalty and Prudence—Unreasonable Investment Management Fees and Performance Losses**

106.     Plaintiff restates and incorporates the allegations contained in the preceding paragraphs.

107.     Defendant is the named fiduciary with the overall responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a). Defendant is the Plan Administrator under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the

Plan, with all powers necessary to enable it to carry out such responsibilities properly, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

108.     Prudent fiduciary practice and investment policy would include (i) quarterly performance evaluation of each of the Plan's investment choices, including comparisons to a benchmark and to a peer group of alternative investments, (ii) putting funds that fell below acceptable standards for a period of consecutive quarters on a watch list, and replacement of a fund after persistent under-performance. The performance of the CREF Stock Account and the TIAA Real Estate Account falls completely outside the guidelines of any reasonable investment policy. The failure to take any affirmative action in light of historic performance and excessive expense could only have occurred in the absence of a prudent process. And if Defendant had engaged in a prudent process, the failure to act in accordance with the obvious conclusion of that process, would be the definition of a breach of the duties of prudence and diligence.

109.     Defendant's failure to adequately evaluate the performance of all the funds in the Plan's investment lineup, including the CREF Stock Account, the TIAA Real Estate Account, or their associated fees and expenses and has caused Plaintiff and the Class millions of dollars in lost earnings. Total Plan losses will be determined after complete discovery in this case

110.     The scope of the fiduciary duties and responsibilities of the Defendant includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. Defendant is directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and

monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

111.     As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

112.     Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the Plan's investment options were retained for reasons other than the best interest of the Plan and its participants, and were causing the Plan to lose millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plan.

113.     Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT III

### Breach of Duties of Loyalty and Prudence --Failure to Monitor Fiduciaries and Service Providers

114.     Plaintiff restates and incorporates the allegations contained in the preceding paragraphs.

115.     Defendant is the named fiduciary with the overall responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a).  Defendant is the Plan Administrator of the Plan under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made

available to participants for the investment of their contributions and provision of their retirement income.

116.    Given that Defendant had the overall responsibility for the oversight of the Plan, Defendant had a fiduciary responsibility to monitor the performance of the other fiduciaries and service providers, including those delegated fiduciary responsibility to administer and manage Plan assets.

117.    A monitoring fiduciary must ensure that its monitored fiduciaries and service providers are performing their obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

118.    Defendant breached its fiduciary monitoring duties by, among other things:

a.    Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b.    Failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperformance of Plan investments in violation of ERISA;

c.    Failing to ensure that the monitored fiduciaries and service providers had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeepers and the amount of any revenue sharing payments; a process to prevent the recordkeepers from receiving revenue sharing that

would increase the recordkeepers' compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

        d.     Failing to ensure that the monitored fiduciaries and service providers considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's mutual fund and insurance company variable annuity options; and

        e.     Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

      119.    Had Defendant discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiffs, and the other Class members lost tens of millions of dollars of retirement savings.

<strong>PRAYER FOR RELIEF</strong>

      For these reasons, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

      1.     Find and declare that the Defendant has breached its fiduciary duties as described above;

      2.     Find and adjudge that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.     Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.     Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

5.     Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.     Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.     Reform the Plan to include only prudent investments;

8.     Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

9.     Certify the Class, appoint the Plaintiffs as class representatives, and appoint their counsel as Class Counsel;

10.    Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

11.    Order the payment of interest to the extent it is allowed by law; and

12.    Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 29th day of April, 2020.

Respectfully submitted,

_____

**BRANDON J. HILL**
Florida Bar Number: 37061
**LUIS A. CABASSA, P.A.**
Florida Bar Number: 0053643
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Direct: 813-337-7992
Main: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: gnichols@wfclaw.com

Michael C. McKay (*pro hac vice application forthcoming*)
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mckay@mckay.law

**CHAD A. JUSTICE**
Florida Bar Number: 121559
**Justice for Justice LLC**
1205 N Franklin St
Suite 326
Tampa, Florida 33602
Direct No. 813-566-0550
Facsimile: 813-566-0770
E-mail: chad@getjusticeforjustice.com
Attorneys for Plaintiffs and the proposed Class